**Opinion issued February 27, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00658-CV**

———————————

**IN THE INTEREST OF K.B., A CHILD**

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-004499J**

---

**MEMORANDUM OPINION**

The Texas Department of Family and Protective Services ("DFPS" or "the Department") sought termination of the parental rights of appellants C.J.A. ("Mother") and W.B. ("Father") to their minor daughter, K.B. ("Kate").[1] After a bench trial, the trial court found that there was clear and convincing evidence to

---

[1] We use a pseudonym for the minor child to protect her privacy.

support two statutory predicate grounds for termination of each parent's rights under Texas Family Code subsections 161.001(b)(1)(E) and (O) ("subsection (E)" and "subsection (O)"). *See* TEX. FAM. CODE § 161.001(b)(1)(E), (O). The court also found that there was clear and convincing evidence that terminating each parent's rights was in Kate's best interest.

On appeal, Mother asserts that the evidence was legally and factually insufficient to support the termination of her parental rights under both subsections. Father concedes the evidence was sufficient to support the trial court's findings under subsection (O) but contends the evidence was legally and factually insufficient to support a finding of endangering conduct under subsection (E). Both parents argue that the evidence is legally and factually insufficient to support a finding that termination of parental rights was in Kate's best interest. Father challenges the trial court's decision to appoint DFPS as Kate's sole managing conservator. We affirm.

## Background

When Kate was born on February 3, 2021, the Department received a referral regarding neglectful supervision by Mother. It was reported that Mother previously had ten children removed from her care and that Mother had a long

history of substance abuse and prior terminations.[2] A Department investigator visited newborn Kate in the NICU. Kate was in the NICU due to her 2.5-pound birth weight, and she remained there until she weighed at least 4 pounds. The investigator interviewed both parents and learned that Kate was Father's first child. Both parents denied having a criminal history or drug history. When Kate was ready to be discharged from the hospital two weeks later, both parents agreed to a safety plan. The terms provided that Father would be the primary caregiver and Mother would have supervised visitation. Kate left the hospital with her parents. An investigator followed up three days later, visited Kate at home, and noted no issues.

Both parents submitted to drug testing on March 4, 2021. By March 25, 2021, the Department learned that both parents had tested positive for cocaine and/or benzoylecgonine, a major metabolite of cocaine. The Department filed its petition for conservatorship and for termination of the parent-child relationship. Before the adversary hearing, the Department received a subsequent referral due to Kate having a fracture of her right femur. Neither parent could explain how she was injured. The Department determined that due to the parents' positive drug tests and Kate's unexplained injuries, she needed to be removed from her parents' care. The Department was awarded temporary managing conservatorship in April. Kate

---

[2] At trial the caseworker testified that mother previously had ten children removed from her care. The record contains termination decrees as to nine children.

was placed with "fictive kin," meaning that her foster parents were the adoptive parents of four of Mother's children, who were Kate's biological siblings. Eventually, the case proceeded to trial.

Trial began in October 2022. At trial, the caseworker testified that Kate came into the Department's care in April 2021. The Department created service plans for each parent. Mother's service plan required her to complete parenting classes, participate in a psychosocial assessment, psychiatric assessment, and substance abuse assessment and follow all recommendations from each, complete random drug testing and abstain from drug use, and provide stable proof of income and housing. She completed the substance abuse assessment and psychosocial assessment, but she did not attend the individual counseling and parenting classes recommended by the assessments. The caseworker testified that though she referred Mother to providers for the counseling, Mother never engaged in it. When the caseworker asked Mother about it, Mother would say that she was working on it. The caseworker visited Mother's residence and found it to be "very cluttered and not child safe."

The caseworker testified that although Mother attends visitation with Kate, she does not interact with Kate for most of the visit. Instead, she spends a lot of time on her phone. The caseworker told Mother that she needs to be more engaged during the visits, but the caseworker did not see any improvement.

The caseworker testified that despite reminding Mother of the importance of her sobriety during the case, Mother continued to test positive for illegal drugs. This was concerning to the caseworker because it showed that Mother had not addressed the major concern that the Department had with her as a parent. Her drug use had been an issue for over a year in the current case and during her prior cases with DFPS. The caseworker did not believe that Mother had demonstrated an ability to provide a safe and stable environment for Kate.

The evidence showed that Mother tested positive for cocaine and benzoylecgonine (a major metabolite of cocaine) in March, April, and May 2021, and March, July, and August 2022. She also tested positive for alcohol in April and May 2021 and March 2022. She did not appear for drug testing in August 2021.

As to Father, the caseworker testified that he had no other children. His service plan required him to complete parenting classes, to participate in a psychosocial assessment and substance abuse assessment and follow all recommendations from each, to complete random drug testing and abstain from drug use, and to provide proof of stable housing and income.

Father completed the psychosocial assessment and its recommendations, which included a psychiatric evaluation. There were no further recommendations from the psychiatric evaluation. He provided proof of stable housing, but his lease had expired in the months before trial, and he had not provided a current one. He

also provided proof of his income. The caseworker testified that Father attends visitation but is not fully engaged with Kate for the entire visit.

Father's drug use remained a concern for the caseworker. Father had not demonstrated sobriety during the pendency of the case. He had positive drug tests from one month after Kate's birth until two months before trial began. The evidence showed that Father tested positive for cocaine and/or benzoylecgonine in March, April, May, August, September, October, November, and December 2021 and in January, March, June, July, and August 2022. He had invalid results in August 2021 and April and May 2022. He did not appear for drug testing in August 2021. The caseworker testified that, in her opinion, the issue that brought Kate to the attention of the Department has not been resolved by either parent, and neither parent has demonstrated an ability to be an appropriate caregiver.

Regarding Kate's foster home, the caseworker testified that Kate is in the care of a foster family who has adopted four of Mother's other children. Kate was placed with the family when she was six months old. At the time of trial, ten children lived in the home. When asked, the caseworker testified that she did not have concerns about Kate's ability to thrive in a home with ten children, as all her needs were met, and she had a happy relationship with each of her family members. The foster family also maintains close contact with another family that adopted some of Mother's children. The two families ensure that all the siblings,

including Kate, maintain a relationship. The caseworker explained that while mother's rights to ten other children have been terminated, Kate has a relationship with all of them.

The guardian ad litem testified that she had observed Kate in her current placement. The placement was appropriate, and Kate was bonded to both the foster mother and foster father. The guardian ad litem did not believe that the number of children in the home was detrimental to Kate. She testified that being in a home with biological siblings was a benefit to Kate's well-being. The guardian ad litem testified that she had observed Mother during visitation. She described Mother as having a "detached type of relationship" with Kate. Mother would interact with Kate for basic needs but did not have a loving, playful relationship with her. The guardian ad litem was unable to visit Mother's home because Mother refused to provide the address.

As to Father's visitation, the guardian at litem observed that he did not know how to respond to Kate's needs. She testified that if Kate was crying, Father would ask what to do and was not aware of how to deal with a small child. The guardian ad litem's main concern with Kate returning to Mother and Father was that both had repeatedly stated that they were the only ones caring for Kate when she broke her femur, yet neither of them could say how it happened. The guardian ad litem thus had no assurance that Kate would be safe in the future.

The foster mother testified that Kate had been in her home since August 2021. When Kate first arrived, she had some developmental delays, yet despite being born premature, she has been able to meet her milestones. The foster mother testified that she advocated for Kate to be placed in her home because it is important that Kate know her siblings and that they all remain in close contact. The foster mother stated that Kate receives extra attention from the other children in the home because she is the baby of the family. There is physically enough room for Kate, and the foster parents meet all Kate's physical, emotional, educational, and financial needs. The foster mother testified that she maintains a relationship with the family that adopted Kate's other siblings, and they do sibling visits regularly. Even though maintaining a relationship between the siblings is not required, the two adoptive families believe that it is important to maintain the sibling bond. The foster mother described that Kate could name her siblings and that she is "very sassy in a good way." The foster mother testified that it is her desire to adopt Kate.

Trial recessed and resumed in June 2023.[3] The caseworker testified that since the October 2022 trial setting, Mother had completed a substance abuse assessment. The guardian ad litem testified that she had been guardian ad litem for three of Mother's children in prior cases with the Department, and, she had known

---

[3] In the months between trial dates, the foster parents and Father's aunt and uncle reached a mediated settlement agreement that provided for Kate to have regular visits with the aunt and uncle. The aunt and uncle had previously intervened in the case.

the family for over eight years. It was her recommendation that the court terminate parental rights to both parents because they had not been able to complete their service plans, despite having additional time between the trial settings.

Mother testified briefly. She stated that she had missed appointments for counseling, but she wanted to complete them. She also testified that she was waiting for a call back from the provider about parenting classes. She denied using cocaine while pregnant with Kate or since Kate was born. Father testified that he had participated in his service plan and attended several visits with Kate. He testified that children are not allowed in his housing, and he had no issue with Kate's placement with her siblings. After closing arguments, the trial court terminated both parents' parental rights pursuant to subsections (E) and (O) and made a finding that termination was in the child's best interest. The Department was awarded sole managing conservatorship of the child.

Both parents appealed. On appeal, Mother challenges both predicate act findings and the best interest determination. Father concedes that there is sufficient evidence to terminate his rights under subsection (O). He challenges the court's finding under subsection (E) and the best interest finding. He also argues that the trial court abused its discretion in awarding sole managing conservatorship to the Department.

## Sufficiency of the Evidence

Mother challenges the sufficiency of the evidence to support the statutory predicate grounds for termination found by the trial court. She challenges the legal and factual sufficiency of the evidence supporting the trial court's findings under subsections (E) and (O). Father challenges the sufficiency of the evidence to support the trial court's finding under subsection (E). He concedes that the trial court had sufficient evidence for its subsection (O) finding. Both parents challenge the sufficiency of the evidence supporting the trial court's finding that termination of parental rights is in Kate's best interest.

### A. Standard of Review

A parent's right to the "companionship, care, custody, and management" of a child is an interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quotations omitted); *see Troxel v. Granville*, 530 U.S. 57, 65 (2000) (stating that this interest "is perhaps the oldest of the fundamental liberty interests recognized by" the United States Supreme Court). We strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). However, although parental rights are "of constitutional magnitude," they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). It is "essential" that courts do not sacrifice the child's emotional and physical interests merely to preserve the parent's rights. *Id.*

Family Code section 161.001 balances the competing interests of the parent and the child by permitting termination of parental rights only if the party seeking termination establishes both that (1) the parent's acts or omissions satisfy at least one statutory predicate ground for termination; and (2) termination is in the child's best interest. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see* TEX. FAM. CODE § 161.001(b). Both the Family Code and the Due Process Clause of the United States Constitution require proof by clear and convincing evidence in termination of parental rights cases. *E.N.C.*, 384 S.W.3d at 802; *see* TEX. FAM. CODE § 161.001(b); *Santosky*, 455 U.S. at 769 (stating that clear and convincing standard of proof "adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process"). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

Because the standard of proof at trial is clear and convincing evidence, on appeal we apply a heightened standard of review when examining the sufficiency of the evidence. *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022); *A.C.*, 560 S.W.3d at 630. In reviewing a legal sufficiency challenge, we must determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding

11

under review was true. *J.W.*, 645 S.W.3d at 741 (quotations omitted). Even under this heightened standard, we must grant deference to the factfinder, "who heard the witnesses and evaluated their credibility." *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021). We view the evidence in the light most favorable to the finding. *J.W.*, 645 S.W.3d at 741. We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* We may not, however, disregard undisputed facts that do not support the finding. *Id.*; *A.C.*, 560 S.W.3d at 630–31. The factfinder remains the "sole arbiter of the witnesses' credibility and demeanor." *J.F.-G.*, 627 S.W.3d at 312 (quotation omitted).

In reviewing a factual sufficiency challenge, we must consider the entire record—including evidence both supporting and contradicting the finding—and determine whether the factfinder could have reasonably formed a firm belief or conviction that the finding was true. *C.H.*, 89 S.W.3d at 25–26; *see A.C.*, 560 S.W.3d at 631 (stating that factual sufficiency review "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding"). If the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction that the finding was true, the evidence is factually

insufficient. *A.C.*, 560 S.W.3d at 631; *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

To affirm a termination judgment on appeal, we need uphold only one predicate ground—in addition to upholding a challenged best interest finding—even if the trial court based its termination ruling on more than one predicate ground. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, termination of parental rights under subsection (E) can serve as the basis for termination of a parent's rights to another child in the future. *See* TEX. FAM. CODE § 161.001(b)(1)(M); *N.G.*, 577 S.W.3d at 234. As a result, due process requires review of a trial court's findings under subsection (E) "even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child." *N.G.*, 577 S.W.3d at 235.

**B.     Statutory Predicate Grounds for Termination**

**1.     Termination under subsection (E)**

The trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. TEX. FAM. CODE § 161.001(b)(1)(E).

"Endanger" means to expose a child to loss or injury or to jeopardize the child's emotional or physical well-being. *J.W.*, 645 S.W.3d at 748. This means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Id.* (quotations omitted).

Under subsection (E), the Department must show that "the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). This subsection requires more than a single act or omission to support termination; instead, the statute requires "a voluntary, deliberate, and conscious course of conduct by the parent." *Id.*; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). In evaluating the sufficiency of the evidence under subsection (E), we may consider conduct both before and after the Department removed the child from the home. *S.R.*, 452 S.W.3d at 360.

It is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *J.W.*, 645 S.W.3d at 748. "The specific danger to the child's well-being may be inferred from parental misconduct standing alone." *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *S.R.*, 452 S.W.3d at 360. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019,

no pet.). A parent's past endangering conduct may create an inference that the conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). The endangering conduct may occur before the child's birth and either before or after the child's removal by the Department. *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Drug use and its effects on the parent's life and ability to parent may establish an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Illegal drug use creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting.").

### a) There is legally and factually sufficient evidence to support the trial court's finding that Mother's conduct endangered Kate.

Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that she endangered Kate because there is no medical documentation or evidence as to how Kate broke her femur. Mother also argues that there is no causal connection between her drug use and endangerment. She argues that the only evidence of her drug use is drug tests that were administered before Kate's birth. She argues that the evidence shows she was

willing to effect positive personal changes because she had no positive drug tests after August 2022.

Texas courts have repeatedly held that drug use and its effects on the parent's life and ability to parent may establish an endangering course of conduct under subsection (E). *See, e.g.*, *J.O.A.*, 283 S.W.3d at 345; *A.A.M.*, 464 S.W.3d at 426. Illegal drug use "exposes the child to the possibility that the parent may be impaired or imprisoned." *In re S.C.F.*, 522 S.W.3d 693, 700 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Drug activity "significantly harms the parenting relationship" and can constitute endangerment even if it occurs outside of the child's presence. *A.M.*, 495 S.W.3d at 579. "In addition, a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *Id.* at 580 (quotation omitted). A factfinder can infer that a parent's failure to submit to court-ordered drug testing indicates that the parent was avoiding testing because they were using drugs. *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

The record contains evidence that Mother has used drugs for many years. She tested positive for cocaine and benzoylecgonine in 2017, 2019, and October

2020. The October 2020 test was also positive for alcohol. Kate was born in February 2021. Mother tested positive for cocaine and benzoylecgonine after Kate's birth and during the pendency of this case in March, April, and May 2021 and in March, July, and August 2022. She also tested positive for alcohol on three occasions during this time. While there are no positive drug test results in the record after August 31, 2022, that is not the same as proof that Mother has tested negative for drugs for any period. There are no drug test results at all in the record after August 31, 2022. Even if the trial court considered the absence of positive tests in the record after August 2022 as evidence of improvement, evidence of improved conduct of a short duration "does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *J.O.A.*, 283 S.W.3d at 346. Mother tested positive at least twelve time both before and after Kate's birth and while the case was pending. The evidence of Mother's history of illegal drug use, her positive drug tests, and her lack of follow through when referred to counseling supported an inference by the trial court that Mother was at risk for continuing drug use. *See In re Y.G.* No. 01-22-00181-CV, 2022 WL 3362953, at *14 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, pet. denied) (mem. op.) (stating two negative drug tests among multiple positive drug tests did not negate history of drug abuse plus history of illegal drug use and prior termination to other

17

children based on drug use that led to neglect supports inference that Mother at risk for future drug abuse).

Mother cites the Fourteenth Court of Appeals's decision in *In re L.C.L.*, 599 S.W.3d 79, 84–86 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc), for the proposition that a parent's drug use standing alone, without evidence of how that behavior endangers a child, cannot support termination under subsection (E). The Fourteenth Court stated that "[a] plain language reading of the statute requires a causal connection between [the mother's] drug use and the alleged endangerment." *Id.* at 84. In this case, Mother argues there is no evidence that her drug use negatively affected Kate. We first note that this Court expressly has declined to adopt the Fourteenth Court's rationale in *L.C.L. See In re D.D.D.*, No. 01-23-00078-CV, 2023 WL 4872399, at *10 (Tex. App.—Houston [1st Dist.] Aug. 1, 2023, no pet.) (mem. op.). Furthermore, this case is factually distinguishable from *L.C.L.* because, here, there is evidence that Mother's drug use did endanger Kate. There is evidence that Mother used drugs both before and after Kate was born. Kate was born prematurely at only 2.5 pounds. She required a NICU stay due to her low birth weight. Given hospital staff concerns, the Department entered into a safety plan with both parents when Kate left the hospital. The plan required Father to be the primary caregiver and allowed Mother to have supervised

visitation. While under this plan, both parents tested positive for drugs in March 2021, and Kate appeared at the hospital with a broken femur in April 2021.

The fact that the record does not contain details related to Kate's femur injury does not preclude the trial court from finding that the injury is evidence of Mother's endangering conduct. The Department originally created a safety plan for Kate that required Father to supervise Mother's interactions with her. The record contains documentation from five prior DFPS cases in which Mother had her rights terminated to nine other children. The most recent termination was only four months before Kate was born. In these cases, Mother was offered services and did not complete them. The Department became further involved when Kate's femur was broken while in the care of Mother and Father. Mother argues that there is no proof of endangerment because the cause of the broken bone is not in the record. The record shows that Kate was in the care of her parents at the time of the injury and yet neither of them could explain how the injury occurred.

Reviewing all the evidence in the light most favorable to the termination findings under subsection (E), we conclude a reasonable factfinder could have formed a firm belief or conviction as to the truth of the findings that Mother endangered Kate through her acts or omissions. *See J.O.A.*, 283 S.W.3d at 344. Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that

19

termination of Mother's parental rights to Kate was warranted under subsection (E). *Id.* at 345. Accordingly, we conclude the evidence is legally and factually sufficient to support the subsection (E) finding as to Mother.

**b) There is legally and factually sufficient evidence to support the trial court's finding that Father's conduct endangered Kate.**

On appeal, father does not challenge the trial court's termination finding under subsection (O). *See A.V.*, 113 S.W.3d at 362 (appellate court need only uphold one predicate finding and best interest termination). He only challenges the evidence to support that termination was in Kate's best interest. Nevertheless, we review the trial court's finding under subsection (E) because of its potential consequences for his parental rights to future children. *N.G.*, 577 S.W.3d at 235.

On appeal, Father argues that the evidence does not support a finding under subsection (E) because the trial court did not establish a direct causal connection between his drug use and actual harm to the child. He argues that there is no evidence he impaired the child or physically harmed her. He states that he was cooperative with the Department and visited regularly with Kate throughout the case. As discussed above, our court has not adopted the rationale that a finding under subsection (E) requires a causal link between drug use and endangerment. *D.D.D.*, 2023 WL 4872399, at *10. The evidence establishes that Father's drug use was so pervasive and serious that the factfinder could reasonably infer that it was endangering. *In re M.A.J.*, 612 S.W.3d 398, 407–408 (Tex. App.—Houston [1st

20

Dist.] 2020, pet. denied) (op. on reh'g) (concluding that evidence of positive drugs tests after department received referral that parent used narcotics was sufficient to support finding of endangerment under subsection (E)).

Kate left the hospital after a stay in the NICU when she was about three weeks old. At that time, both parents agreed to a safety plan with the Department. Under the plan, Father was to be the primary caregiver and allow Mother to have supervised visitation with Kate. When Kate was about two months old, she broke her femur. While both parents stated that they were the only people caring for Kate, neither of them could identify the cause of her injury.

Both parents tested positive for drugs on March 4, 2021, about a week after leaving the hospital with Kate. Father tested positive for high levels of cocaine, benzoylecgonine, and norcocaine. After Kate was removed from the parents' care, Father continued to use drugs throughout the pendency of the case. He tested positive for cocaine and/or benzoylecgonine in April, May, August, September, October, November, and December 2021 and in January, March, July, and August 2022. He had invalid results in August 2021 and April and May 2022. This and numerous courts of appeals have recognized that a parent's decision to use illegal drugs while the termination suit is pending, and the parent is at risk of losing his child, may support a finding of endangering conduct under subsection (E). *D.H. v. Tex. Dep't of Family & Protective Svcs.*, 652 S.W.3d 54, 62 (Tex. App.—Austin

21

2021, no pet.) (citing cases from First, Second, Third, and Fifth courts of appeals).

"A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with [his] children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of [his child]." *In re M.T.W.*, 01-11-00162-CV, 2011 WL 6938542, at *13 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) (quotation omitted). Illegal narcotics use creates the possibility that a parent will be impaired or imprisoned, and thus, incapable of parenting, supporting termination. *Walker*, 312 S.W.3d at 617. Father did not demonstrate sobriety during the pendency of the case.

Reviewing all the evidence in the light most favorable to the termination finding under subsection (E), we conclude that a reasonable factfinder could have formed a firm conviction or belief as to the truth of the finding that Father engaged in endangering conduct. *See J.O.A.*, 283 S.W.3d at 344. The disputed evidence that a reasonable factfinder could not have credited in favor of this finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction as to the truth of these termination findings. *Id.* at 345. We hold that the evidence is legally and factually sufficient to support the predicate termination finding under subsection (E).

## 2. Termination under subsection (O)

Subsection (O) provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of the child who has been in the Department's care for not less than nine months. TEX. FAM. CODE § 161.001(b)(1)(O).

Father concedes that the evidence was sufficient to support the trial court's predicate finding under subsection (O) as to his ability to follow a service plan. We have also held that the evidence is sufficient to support the trial court's finding of endangerment under subsection (E) as to both parents. Having concluded that the evidence is legally and factually sufficient to support the trial court's finding of endangerment under subsection (E) as to Mother, we need not discuss Mother's challenge to the court's findings under subsection (O). *See A.V.*, 113 S.W.3d at 362 (requiring appellate court to uphold one predicate act finding and best interest determination to affirm decree).

## C. Best Interest Finding

In addition to a statutory predicate ground for termination, the trial court must also find by clear and convincing evidence that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(2). There is a strong presumption "that

the best interest of a child is served by keeping the child with a parent," *see R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam), but there is also a presumption that "the prompt and permanent placement of the child in a safe environment" is in the child's best interest. TEX. FAM. CODE § 263.307(a). The best-interest inquiry is "child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631.

In reviewing the trial court's best interest finding, we consider several non-exclusive factors including: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) whether programs are available to assist those individuals; (6) the plans for the child by those individuals; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *E.N.C.*, 384 S.W.3d at 807 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)).

The court need not have evidence on every element to make a valid finding on best interest. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *In re J.G.S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) ("The absence of evidence about some of the factors

24

would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest."). But a lack of evidence "does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

No one factor is controlling, but in a particular situation, analysis of a single factor may be adequate to support a finding that termination is in the best interest of the child. *J.M.T.*, 519 S.W.3d at 268; *see J.D.G.*, 570 S.W.3d at 853 ("In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the child's best interest; in other cases, there could be more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice to support termination.") (quotations omitted). Proof of acts or omissions relevant to a predicate ground for termination does not relieve the Department of proving that termination is in the child's best interest, but the same evidence may be probative of both elements *A.C.*, 560 S.W.3d at 631–32. We may consider circumstantial evidence, subjective factors, "and the totality of the evidence as well as the direct evidence." *J.D.G.*, 570 S.W.3d at 854 (quotations omitted).

Mother contends that Kate's best interest cannot be fully addressed without determining whether a home where ten children reside, like the foster parents' home, can be in the best interest of a child. Father argues that there is insufficient evidence to support the trial court's best interest finding as to him. The Department

25

responds that the number of children in the home is irrelevant under the circumstances and that the evidence supports the trial court's finding.

With respect to the desires of the child, there is no direct evidence about Kate's desires because she was less than two years old at the time of trial. *See Holley*, 544 S.W.2d at 371–72 (factor one). "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with [their] parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Kate was removed from her parents' care when she was two months old and placed with the foster family when she was six months old. At the time of trial, she had been with the family for more than a year. The placement was considered a kinship placement because the foster parents had adopted several of Kate's siblings. The foster mother advocated for Kate to be placed in their home because it was important to her that Kate and her siblings remain in close contact. The foster mother testified that Kate gets extra attention because she is the baby in the family and that there is enough space for Kate and her siblings in the house. Additionally, the foster mother testified that she is in contact with the adoptive parents of Kate's other siblings, and the two groups of siblings get together regularly. The foster mother desired to adopt Kate. This evidence weighs in favor of the best-interest finding.

Next, evidence of each parent's drug use is relevant, not only to their parenting abilities and to the stability of the home they would provide, but also to the emotional and physical needs of the child, now in and in the future, and to the emotional and physical danger in which the child could be placed, now and in the future. *See Holley*, 544 S.W.2d at 371–72 (factors two, three, four, and seven); *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (pattern of illegal drug use suggested mother was not willing and able to provide child with safe environment—a primary consideration in determining child's best interest). A factfinder may afford great weight to the significant factor of drug-related conduct. *N.J.H.*, 575 S.W.3d at 834 (considering parent's history of drug use in affirming trial court's determination that termination was in best interest of child). A parent's drug use is a condition indicative of instability in the home environment because it exposes a child to the possibility that a parent may be impaired or imprisoned. *See A.M.*, 495 S.W.3d at 579.

As discussed above, the evidence shows that Mother previously had nine children removed from her care, and she had a long history of substance abuse. She also continued to test positive for illegal drugs throughout the pendency of the case. She tested positive for cocaine and benzoylecgonine in 2017, 2019, and October 2020. The October 2020 test was also positive for alcohol. Kate was born in February 2021. Mother tested positive for cocaine and benzoylecgonine in

March, April, and May 2021 and in March, July, and August 2022. She also tested positive for alcohol on three occasions during this time. The caseworker described Mother's continued drug use as concerning, given the many years she had used drugs and her drug use while under the threat of termination of her parental rights. A parent's exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care for the child." *In re J.M.* No. 01-14-00826-CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.).

Although Mother completed a psychosocial assessment early in the case, she did not complete the subsequent recommendations for counseling. She also did not complete a psychiatric assessment. Mother failed to complete parenting classes. She testified that she was waiting for a call to facilitate completing them, but she made no efforts to complete the required classes during the pendency of the case. The caseworker described Mother's home as very cluttered and not safe for a child, and Mother refused to provide the guardian ad litem with her address for a home visit. A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the child's best interest. *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Father likewise tested positive for drugs throughout the case. He tested positive for cocaine and/or benzoylecgonine in March, April, May, August, September, October, November, and December 2021 and in January, March, July, and August 2022. He had invalid results in August 2021 and April and May 2022. *In re J.M.*, 2015 WL 1020316, at *7 (stating parent's poor judgment demonstrates inability to provide adequate care for child). The trial court could reasonably infer that Father was at risk for future drug abuse.

Further, the trial court heard evidence that Kate sustained a femur fracture while in the care of her parents. Though they were her sole caregivers, neither parent could explain how Kate sustained the injury. This evidence is supportive of the trial court's best-interest finding under the third *Holley* factor: the emotional and physical danger to the child now and in the future. *See Holley*, 544 S.W.2d at 371–72.

With respect to programs available to assist the parents in promoting the child's best interest, the trial court may properly consider whether each parent complied with the court-ordered service plan for reunification with the child. *See E.C.R.*, 402 S.W.3d at 249. Father's compliance with certain court-ordered tasks during the proceedings weighs in his favor and against the best-interest finding. He completed a psychosocial assessment and a psychiatric evaluation. He engaged in regular visitation with Kate. He provided proof of stable housing at the beginning

of the case, but his lease had expired, and the caseworker did not have an updated lease. He provided proof of his income, but he did not complete parenting classes. Even though Father participated in several of the court ordered services, the evidence also shows that he was unable to refrain from illegal drug use.

Conversely, with respect to the foster parents' abilities to parent Kate and to provide a stable home, the evidence shows that Kate was thriving.[4] The trial court heard directly from the foster mother that Kate was thriving in the placement. The court heard of the family's love for Kate and their desire to raise her through adulthood with her siblings, including both Kate's biological siblings and their other children. The court heard testimony that, though not required to do so, the family tries to maintain a bond among all of Mother's biological children, including Kate's siblings in another adoptive home. Kate was thriving in the foster family. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of child and affirming finding that termination was in child's best interest when child was thriving in foster care). We defer to the trial court's assessment of the foster mother's credibility and demeanor in crediting this testimony as evidence in favor

---

[4] Father concedes this point in his brief, stating, "it was evident that [Kate]'s current placement wanted to maintain a relationship with [her] biological family members. To that end, Father likewise was not opposed to [Kate] remaining with her current placement—in fact, he agreed that she should stay with her siblings as his present housing situation did not permit children." App. Br. at 48.

of the trial court's best-interest finding. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re S.G.A.R.*, No. 01-18-00291-CV, 2018 WL 4705835, at *7 (Tex. App.—Houston [1st Dist.] Oct. 2, 2018, no pet.) (mem. op.).

Considering the evidence in a light favorable to the trial court's judgment, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in Kate's best interest. *See J.F.C.*, 96 S.W.3d at 266.

We overrule each parent's challenge to the trial court's best interest finding.

## Conservatorship Determination

In a final issue, Father challenges the trial court's decision not to appoint him as Kate's sole managing conservator. When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, the Department of Family and Protective Services, or a licensed child-playing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *J.D.G.*, 570 S.W.3d at 856. Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *J.D.G.*, 570 S.W.3d at 856.

An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once

we overrule a parent's challenge to an order terminating his parental rights, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination." *J.D.G.*, 570 S.W.3d at 856 (quotation removed).

Because we have overruled Father's challenge to the portion of the trial court's order terminating his parental rights, the order has divested Father of his legal rights and duties related to Kate. *See* TEX. FAM. CODE § 161.206(b); *In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.). Therefore, Father does not have standing to challenge the portion of the order appointing DFPS as Kate's conservator. *J.D.G.*, 570 S.W.3d at 856. We overrule Father's issue related to managing conservatorship.

## Conclusion

We affirm the decree of the trial court.


Peter Kelly
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.